IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MICHAEL THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-588-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Michael Thompson ("Thompson"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Thompson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Thompson was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Thompson was 50 years old at the time of the hearing before the ALJ on August 27, 2009.  (R. 40).  He was a high school graduate, and he had completed a course in machine tool technologies and taken some portion of an electronics course.  (R. 43).  Thompson had driven to the hearing, but he testified that he had only been driving since November 2008.  (R. 46-47).  If

he had to drive any distance, he wore a brace around his ribs to help his back.  (R. 47).   He would stop to walk about every 15 or 20 minutes, because his back hurt from the sitting.  *Id.*  He had a handicapped parking permit.  (R. 55).

Thompson testified that he slept only three or four hours a night.  (R. 47).  He slept in a recliner, and he would wake up three or four times a night due to muscle spasms or a need to use the bathroom.  (R. 47-48).  Because of the lack of sleep, he felt fatigued, and it affected his concentration.  (R. 63-64).

Thompson had difficulty estimating what distance he could walk, but he used a cane if he had to walk far.  (R. 48-49).  He also took breaks to sit when walking long distances, and he would get sore from doing much walking.  (R. 49).  He wouldn't make a trip that required much walking two days in a row, because he would have to take more medicine than he thought was acceptable to control his pain.  *Id.*  Thompson thought that he could stand for 30 or 45 minutes without his cane, as long as he hadn't been walking for a long time before.  (R. 49-50).  After he had stood for a long time, he would sit down to get relief.  *Id.*   After walking or standing a lot one day, the next day he would be miserable.  (R. 50).

Thompson testified that he found it painful to walk up or down stairs, and if he did that he would probably need to rest part-way.  (R. 59-60).  At his home, he used the back door because it only had one step, so he could avoid the six steps at the front door.  (R. 60).  He tried to use a ladder a few months before the hearing, and his left leg quivered.  (R. 60-61).  He would not try to use a ladder again.  *Id.*

He could usually only sit for about 20-30 minutes, but sometimes he could get in a comfortable position and sit for about 45 minutes.  (R. 57).  After that time, he would need to stand up or change positions.  *Id.*  After sitting for a while, his left leg would become numb, and

he would have a knife-like pain.  (R. 57-58).  He used a recliner virtually all the time when he was sitting at his house, because it was the most comfortable position.  (R. 58).

Thompson testified that he could move a medium-sized bag of dog food from the store shelf into his basket, but it was a sliding motion rather than a lifting motion.  (R. 59).  He could lift a bottle of bleach from the floor and put it on a table.  *Id.*  He could not do that lifting repetitively.  *Id.*  He had trouble with the grip of his dominant left hand.  (R. 41, 61-62).  He had dropped things with his left hand and made messes, so he tried to use his right hand.  (R. 61-62).

On a typical day, Thompson tried to take his son to school, and then he met his father for breakfast at his coffee shop at least three mornings a week.  (R. 50).  On a good day, he would try to visit his friends who had businesses in Bristow.  *Id.*  There were some days that he didn't leave his house because it was too painful to get in his pickup truck.  (R. 51).  He was sometimes nauseated from the pain, especially from over-the-counter pain medications he had to use before he obtained medical insurance.  (R. 51-52).  On days that he didn't leave the house, he would change positions trying to get relief and he might have to take all of the pain medications he was given.  (R. 52).  On a good day, he might use an edger to do lawn work.  (R. 53-54).  He could roll the edger out of his garage, and he could use it in some areas, but he needed someone else to start it, and he couldn't use it in all areas because he couldn't keep it level.  *Id.*  If he had trouble with it, he would wait and let his son do it.  (R. 54).  He couldn't use the lawn mower.  (R. 54-55).

To do shopping, he could walk if he only needed to get one item.  (R. 55).  If he needed to do grocery shopping for many items, he used one of the electric riding carts the stores provided.  *Id.*  He occasionally cooked.  (R. 56).  For a recent big meal, he brought in a chair or a stool to help him in the kitchen.  *Id.*

In addition to giving relief from pain, the medications made him feel "fuzzy-headed" and sleepy. *Id.* Thompson testified that he needed to use the bathroom frequently due to bowel and urinary incontinence issues. (R. 58-59). Cold weather made him stiff in his neck area and in the area of his left hip up to a few inches above his belt line. (R. 61). He tried to read, but on a bad day reading would make him have a headache. (R. 64). He had two or three headaches a week that would sometimes last for hours. (R. 64-65).

Thompson testified that he had pain every day. (R. 65). His constant pain level was approximately 4-5 on a 1-to-10 scale. (R. 65-66). This pain was mostly in his low back and left leg. (R. 66). Several times a week, he would have pain at an 8 level. (R. 66).

Records from Saint Francis Hospital indicate that Thompson fell at work on September 10, 2007, hitting his head and lower back. (R. 249-89). According to a discharge summary dated September 19, 2007, Thompson was seen at the emergency room and sent home. (R. 262). He returned on September 11, 2007, with a worsening headache, vomiting, urinary incontinence, and low back pain. *Id.* His discharge diagnoses were closed-head injury with concussion; lumbar degenerative changes; degenerative disc disease at C3/C4 resulting in encroachment upon the left neural foramen but without significant spinal stenosis; and degenerative disc disease at L4/L5 and L5/S1 with borderline acquired spinal stenosis at L5/S1 and encroachment upon the neural foramina bilaterally at L5/S1. *Id.* He was prescribed physical therapy and several different forms of pain medication. *Id.*

On September 27, 2007, Douglas R. Koontz, M.D., with Neurosurgery Specialists, saw Thompson and wrote a letter to Thompson's workers compensation insurer. (R. 244-46). Dr. Koontz had been a consultant during Thompson's hospitalization, and in the letter he briefly reviewed Thompson's history. (R. 244). On examination, Dr. Koontz said that Thompson

appeared uncomfortable, he was wearing a back brace, and he had trouble getting up and down due to back pain.  *Id.*  Thompson was using a cane for stability.  (R. 244-45).   Thompson reported some continued difficulty with speech, which Dr. Koontz said was related to his post-concussive syndrome.  (R. 245).  Thompson had diffuse back pain, and he described numbness in his left leg.  *Id.*  Straight leg raising was uncomfortable bilaterally.  *Id.*  Dr. Koontz referred Thompson to a pain management physician and wanted him to continue physical therapy.  *Id.*  He said that Thompson would continue to use his back brace and neck brace for comfort.  (R. 245-46).  He stated that Thompson was unable to work and would be able to return to work "if and when his pain is under better control," and he said that the pain management physicians could help determine that.  (R. 245).

Bristow Medical Center Physical Therapy conducted an initial evaluation of Thompson on September 24, 2007.  (R. 302-03).  Thompson reported that he had significant back pain, and that pain radiated into his left leg.  (R. 302).  He said it was constant but the pain increased with prolonged sitting or standing of 15 to 20 minutes.  *Id.*  Thompson was wearing a lumbar back support.  *Id.*  Thompson was not using a cane, but his gait was observed as unsteady, and he was described as shaky and moving slowly and with extreme difficulty.  *Id.*  His range of motion was significantly limited in his lumbar spine and both hips.  *Id.*  He had significant tenderness in his left lumbar paraspinals and left sacral region extending into his left hip.  *Id.*  Thompson attended 11 physical therapy sessions in September and October 2007.  (R. 298-301).

Frank J. Hackl, M.D. of Tulsa Integrated Pain Services conducted an initial evaluation of Thompson on October 12, 2007.  (R. 329-30).  Dr. Hackl stated that Thompson complained of increasing problems with numbness and weakness in his left leg and left arm, and Thompson complained of dropping things.  (R. 325).  On examination, Thompson's reflexes were intact

throughout, but his right toes were downgoing and his left toes were not.  (R. 326).  Dr. Hackl's impression was that Thompson appeared to have a changing neurologic status, and he referred him for additional MRI studies followed by a neurologic evaluation.  *Id.*

An MRI was conducted on October 26, 2007, and the report notes that Thompson was not cooperative due to discomfort.  (R. 327-28).  The reviewing physician found that there was degenerative dessication at L4/L5 and L5/S1 without loss of disc space height.  (R. 327).   There was nonspecific broad-based disc bulging with the dural diameter at the lowest limit of normal at these levels.  *Id.*  The reviewing physician attempted a contrast MRI on November 13, 2007, but found it to be an "extremely limited examination," because Thompson moved during the study.  (R. 326).

John D. Hastings, M.D. saw Thompson for a neurologic evaluation on November 20, 2007.  (R. 323-25).  Dr. Hastings noted that Thompson was very tremulous and shaky.  (R. 324).  Thompson moaned and grunted on motion, his movement was slow and deliberate, and he used a quad cane with his left hand.  *Id.*  Thompson reported diminished vibratory sensation to his left hand, left foot, and the left side of his skull.  *Id.*  Dr. Hastings had reviewed the MRI studies that had been completed the week before, and he found Thompson to be neurologically intact.  (R. 324-25).  He had no neurologic explanation for the tremulousness, and he found no sign of traumatic brain injury.   (R. 325).  He recommended conservative treatment including pain management and physical therapy.  *Id.*

Dr. Hackl gave Thompson cervical and lumbar epidural steroid injections on December 5, 2007.  (R. 351-58).

A progress note signed by a physical therapist at Oklahoma Surgical Hospital dated February 21, 2008 indicated that Thompson had completed 15 visits but had made minimal

progress.  (R. 448).  The note stated that Thompson exhibited inconsistent pain behaviors.  *Id.*  It also stated that Thompson demonstrated shaking of the whole body, at times, that the therapist had difficulty describing.  *Id.*  Following this progress note are three pages:  a cervical addendum, a lumbar addendum, and a page titled "Waddell Signs."[1]  (R. 449-51).  It is difficult to determine if these pages are associated with the progress note.  *Id.*  The Waddell Signs page has six out of seven numbered items circled.  (R. 451).

Records indicate that Thompson attempted physical therapy in March 2008, but was unable to tolerate the procedures.  (R. 359-64).

Dr. Hackl saw Thompson on March 20, 2008.  (R. 515).  He explained to Thompson that he did not believe that he was the appropriate physician to manage his case and he referred Thompson to Dr. Pettingell who he believed could better treat him.  *Id.*  He also prescribed continued physical therapy without the procedures that had caused Thompson difficulty.  *Id.*

Thompson was seen at Excel Therapy Specialist on April 7, 2008 for a initial evaluation.  (R. 439-40).  An April 18, 2008 progress note stated that Thompson was compliant with therapy but had made little progress.  (R. 435-36).  He completed physical therapy at Excel in May 2008.  (R. 392-93, 431-32).

Thompson was seen by Timothy G. Pettingell, M.D. with Oklahoma Physical Medicine and Rehabilitation on April 10, 2008.  (R. 417-22).  Dr. Pettingell reviewed Thompson's history regarding the September 2007 injury, including all of the reports from the various medical sources.  (R. 417-19).  On examination, Dr. Pettingell observed that Thompson alternated

---

[1] "Waddell signs are indications that a patient has nonorganic pain. They are used to identify patients who may require detailed psychological assessment. Three or more Waddell signs are deemed clinically significant."  *Wall v. Astrue*, 561 F.3d 1048, 1056 n.10 (10th Cir. 2009) (further citation omitted).

between appearing comfortable and demonstrating significant pain mannerisms. (R. 420). Dr. Pettingell described Thompson's perception of diminished sensation in his left arm and leg as "patchy" and in a "nonanatomical distribution." *Id.* Dr. Pettingell made numerous detailed observations of the examination. (R. 420-21). His impression was a history of work-related injury with subjective paresthesias and cervical/lumbar strain. (R. 421). Dr. Pettingell said that the examination demonstrated Waddell's signs and that there was no identified objective neurological pathology. *Id.* He ordered a urine drug screen, he said that repeat imaging was required, and he recommended neuropsychiatric testing to better assess the alternate diagnoses of traumatic brain injury versus somatoform disorder. (R. 421-22).

MRI imaging of Thompson's cervical and thoracic spine and brain was done on April 16, 2008. (R. 442-44).

Thompson was seen by David E. Hansen, Ph.D. on May 1, 2008 for a neuropsychological evaluation. (R. 376-81). Dr. Hansen noted that Thompson exhibited pain behaviors and a motor tremor that was worse when he focused on it and better if he was distracted. (R. 377). He used his cane on his left side, stating that he had been instructed to do so by physical therapy. *Id.* Dr. Hansen administered many different tests and described the results. (R. 378-80). Dr. Hansen's opinion was that Thompson's performance on the tests showed "strong indications of response bias." (R. 377-78). Dr. Hansen also observed variable effort throughout the evaluation. (R. 378). Dr. Hansen therefore believed that the test results were not reflective of Thompson's maximum abilities, but could only be used to establish minimal estimates of functioning. *Id.* He noted that Thompson scored in the upper limits of the average range for working memory, which he stated is typically a measure that is sensitive to traumatic brain injury. (R. 379). Dr. Hansen said that Thompson's responses to a personality assessment inventory suggested "emotional

contributions to his physical symptoms," although he believed another test indicated no formal

somatoform disorder.  (R. 380).  Thompson's results on another test indicated a "tendency to

report a wide variety and severity of symptoms," and "an extreme level of perceived functional

disability."  *Id.*  Dr. Hansen's Axis I[2] diagnosis was response bias, with a note to rule out

adjustment disorder with depressed mood.  (R. 381).

     Dr. Pettingell saw Thompson again on May 27, 2008.  (R. 415-16).  Dr. Pettingell

reviewed the MRI studies of April 16, 2008 and stated that the brain study and thoracic spine

study were unremarkable.  (R. 415).  The cervical spine study showed a subtle disc protrusion at

C4/C5.  *Id.*  He said that there was no explanation for Thompson's reported left-sided

symptoms.  *Id.*  He reviewed Dr. Hansen's report and said that there were no objective

neuropsychological results to indicate the presence of a mild traumatic brain injury.  *Id.*  Dr.

Pettingell informed Thompson of these results, and he said that Thompson's only complaint was

left-sided low back pain with left lower extremity weakness/pain/numbness.  *Id.*  He discussed

additional treatment, including physical therapy.  *Id.*  In Dr. Pettingell's opinion, Thompson had

reached maximum medical improvement regarding the September 2007 work injury, he required

no further treatment, and he could return to work with no restrictions.  *Id.*  Dr. Pettingell viewed

Thompson's symptoms of low back and left leg pain as preexisting.  *Id.*  Finally, he noted that

the urine drug screen test performed on April 10, 2008 showed no opiates even though

Thompson reported his current medications as OxyContin and Percocet.  (R. 416).

     Kenneth R. Trinidad, D.O. saw Thompson on August 4, 2008 and submitted a report to

---

    [2]The multiaxial system "facilitates comprehensive and systematic evaluation."  American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text
Revision 4th ed. 2000).

Thompson's attorneys apparently as part of the workers compensation proceedings.  (R. 365-69).

Thompson was wearing a lumbar back brace and using a cane.  (R. 367).  On physical

examination, Thompson had tenderness and spasm in the lumbar spine.  *Id.*  Straight leg raising

was positive in the left leg, and he had limited range of motion in the cervical and lumbar spine.

*Id.*  There was decreased sensation in Thompson's left hand as well as in a L5 and S1 distribution

in the left leg.  *Id.*   Dr. Trinidad's first impression was spine injuries that were in addition to

lumbar disc disease and left leg radiculitis secondary to the September 10, 2007 injury.  (R. 368).

His second impression was closed head trauma with post-traumatic headaches from the work

injury.  *Id.*  He did not believe that Thompson was at maximum medical improvement, and he

recommended  further consultations and testing.  *Id.*

On November 5, 2008, Randall Hendricks, M.D. of Central States Orthopedic examined

Thompson and provided a second opinion report apparently in connection with the workers

compensation proceedings.  (R. 493-95).  Dr. Hendricks had reviewed the previous reports of the

prior physicians.  (R. 494).  On physical examination, Dr. Hendricks noted that Thompson used a

quad cane to walk.  *Id.*  He also described "give-way" weakness of Thompson's left leg as

"exceedingly abnormal."  *Id.*  He stated that Thompson had several Waddell's signs that strongly

suggested an emotional component to his complaints of pain.  *Id.*  Dr. Hendricks stated that

Thompson did have a left-sided L5/S1 disc herniation that could produce some of his left leg

complaints, but he also had a "strong emotional overlay."  *Id.*  He found that Thompson had

reached maximum medical improvement, and he suggested a permanent restriction of no lifting

over 40 pounds.  (R. 495).

Dr. Trinidad saw Thompson again on December 8, 2008 and gave an opinion regarding

permanent impairment. (R. 497-502).  Dr. Trinidad's opinion was that Thompson's condition

was stable and chronic, and he had reached maximum medical recovery.  (R. 501).  He stated that Thompson would benefit from ongoing pain management and medications.  *Id.*  He believed that Thompson would require eventual lumbar spine surgery.  *Id.*  Dr. Trinidad considered Thompson temporarily totally disabled from September 10, 2007 through November 5, 2008.  *Id.*  Further, his opinion was that Thompson was permanently 100% disabled.  *Id.*

Thompson was seen at the emergency room at Bristow Medical Center on August 18, 2009 with chest pain.  (R. 543-44).  He was diagnosed with esophageal spasm and gastroesophageal reflux disease.  (R. 544).  Thompson saw an advanced registered nurse practitioner at Bristow Medical Center on August 19, 2009 for follow-up from the emergency room visit.  (R. 532-33).  Thompson complained of left chest pain and back pain.  (R. 532). The practitioner said that Thompson was taking too much ibuprofen, she prescribed Lortab, she ordered blood tests, and she referred Thompson to a pain specialist.  (R. 532-33).

Thompson was seen by Kalvin White, D.O. at Tulsa Spine & Specialty Hospital on February 12, 2010 for a lumbar discogram.  (R. 558-66).   The L5/S1 disc was symptomatic and appeared degenerated.  (R. 562).  The L4/L5 disc was symptomatic and appeared degenerated with a question of extension to the left.  *Id.*   The post-discogram CT scan showed that the L5/S1 level had "complete disruption of the annulus."  (R. 563).  The L4/L5 disc had "complete disruption of the posterior annular margin."  *Id.*

Nonexamining agency consultant Tom Shadid, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on October 9, 2008. (R. 466-83).  On the Psychiatric Review Technique Form, for Listing 12.02, Dr. Shadid noted Thompson's history of traumatic brain injury.  (R. 471).  For Listing 12.04, Dr. Shadid noted Thompson's possible adjustment disorder with depressed mood.  (R. 473).  For the "Paragraph B

Criteria,"[3] Dr. Shadid found that Thompson had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 480).  In the "Consultant's Notes" portion of the form, Dr. Shadid summarized the history of Thompson's injury on September 10, 2007 and his diagnosis of concussion.  (R. 482).   He recounted that imaging studies of Thompson's brain had been unremarkable.  *Id.*  He summarized the report of Dr. Hansen, and he recounted Thompson's activities of daily living.  *Id.*

On the Mental Residual Functional Capacity Assessment, Dr. Shadid found that Thompson was moderately impaired in his ability to understand, remember, and carry out detailed instructions.  (R. 466).  He found that Thompson was not significantly limited in any other functional areas.  (R. 466-67).   In his narrative comments, Dr. Shadid found that Thompson could perform simple and some complex tasks, could relate to others on a superficial work basis, and could adapt to work situations.  (R. 468).

Agency nonexamining consultant Lise Mungul, M.D. completed a Physical Residual Functional Capacity Assessment on October 10, 2008.  (R. 484-91).  For exertional limitations, Dr. Mungul found that Thompson could perform light work.  (R. 485).  In the space for narrative explanation of this opinion, Dr. Mungul summarized Dr. Pettingell's May 7, 2008 report and his release of Thompson to work with no restrictions.  (R. 485-86).  Dr. Mungul stated that this

---

[3]There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

exertional limitation was based on the objective evidence of significant degenerative disease of the lower spine. (R. 486). For postural limitations, Dr. Mungul found that Thompson could only occasionally climb, balance, stoop, kneel, crouch, or crawl. *Id.* She found no additional limitations. (R. 487-91).

Following Dr. Hendricks' second opinion report, agency nonexamining consultant Luther Woodcock, M.D. completed a second Physical Residual Functional Capacity Assessment on January 8, 2009. (R. 506-13). Dr. Woodcock also found that Thompson could perform work at the light exertional level, and he noted Dr. Hendricks' restriction of no lifting in excess of 40 pounds. (R. 507-08). As had Dr. Mungul, Dr. Woodcock found that Thompson could only occasionally climb, balance, stoop, kneel, crouch, or crawl, and he found no additional limitations. (R. 508-13).

### Procedural History

Thompson filed an application on August 21, 2008, seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 152-55). Thompson alleged onset of disability as September 10, 2007. *Id*. He filed an application for supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. on August 28, 2008. (R. 156-59). The applications were denied initially and on reconsideration. (R. 80-88, 91-96). A hearing before ALJ John W. Belcher was held August 27, 2009 in Tulsa, Oklahoma. (R. 37-74). By decision dated November 6, 2009, the ALJ found that Thompson was not disabled. (R. 19-31). On July 17, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v.*

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Thompson's date last insured was September 30, 2010. (R. 21). At Step One, the ALJ found that Thompson had not engaged in any substantial gainful activity since his alleged onset date of September 10, 2007. *Id.* At Step Two, the ALJ found that Thompson had severe impairments of degenerative disc disease and degenerative joint disease of the cervical and lumbar spine; dizziness, due to medications; and affective mood disorder. *Id.* The ALJ stated that Thompson's allegations of headaches and an organic mental disorder were considered medically non-determinable. *Id.* At Step Three, the ALJ found that Thompson's impairments did not meet any Listing. *Id.*

In his RFC determination, the ALJ found that Thompson had the RFC to perform a limited range of light work. (R. 22-23). He found that Thompson was required to have the ability to change positions every half hour. *Id.* Thompson could only occasionally climb stairs, balance, stoop, crouch, kneel, or crawl, and he could never climb ladders. *Id.* Thompson needed to avoid exposure to unprotected heights and to dangerous moving machinery. *Id.* He could perform simple and some moderately complex work. *Id.* At Step Four, the ALJ found that

Thompson could not return to his past relevant work.  (R. 29).  At Step Five, the ALJ found there were a significant number of jobs in the national economy that Thompson could perform considering his age, education, work experience, and RFC.  (R. 30).  Therefore, the ALJ found that Thompson was not disabled through the date of the decision.  (R. 31).

**Review**

Before discussing the merits of Thompson's appeal, the Court notes the requirements of a claimant in articulating his arguments before this Court.  These requirements were discussed by the majority in the Tenth Circuit case of *Wall*, 561 F.3d at 1066.  In *Wall*, the court discussed an argument related to the claimant's RFC.  *Id.*  The Tenth Circuit noted that at the district court level, the claimant had merely alleged, several times, that the ALJ had failed to consider the objective medical evidence.  *Id.*  The appellate court cited to the opinion of the district court judge, stating that "[b]ecause Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived."  *Id.*  The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue.  *Id.* (quotation and citation omitted).  *See also Krauser v. Astrue*, 638 F.3d 1324, 1326 (10th Cir. 2011) (Tenth Circuit's review is limited to issues the claimant preserved at the district court level and adequately presented on appeal).

With this as a framework, the undersigned acknowledges that Thompson has, at least in a perfunctory manner, raised five issues on appeal: (1) The ALJ erred in finding Thompson's headaches were medically non-determinable at Step Two; (2) The ALJ erred in failing to find that Thompson met a Listing at Step Three; (3) the ALJ erred in his evaluation of Thompson's pain; (4) the ALJ erred in finding that the claimant retained the RFC to perform a limited range

of light work; and (5) The ALJ erred by failing to find that Thompson was disabled pursuant to the Grids.[5]

Regarding the issues raised by Thompson, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

**Allegation of Error at Step Two**

Thompson asserts as his last argument that the ALJ "failed to apply a proper standard" when he found at Step Two that Thompson's headaches were medically non-determinable. Plaintiff's Opening Brief, Dkt. #12, p. 10.  It is well-settled law in this circuit that any error at Step Two is harmless so long as the ALJ finds at least one condition to be severe, so that the five-step sequential evaluation continues.  *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) (no error in ALJ's failure to include claimant's reflex sympathetic dystrophy as severe impairment at Step Two);  *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (any error at Step Two was harmless when ALJ properly proceeded to next step of evaluation sequence). Therefore, because the ALJ found severe impairments at Step Two, there was no reversible error at this step.

It would have been better practice, however, for the ALJ to give an explanation of how he came to the conclusion that Thompson's headaches and "organic mental disorder" were medically non-determinable.  (R. 21).  There was certainly substantial evidence supporting this

---

[5]The Grids are the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.  The Grids are based on the four relevant factors contained in the Social Security Act: physical ability, age, education, and work experience.  They provide a "shortcut" of rules that determine whether jobs exist in significant numbers that a claimant with certain characteristics can perform.  *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir.1995).

determination.  First, the medical records following Thompson's September 2007 accident show

that his complaints involved his back and his left leg, with few complaints of headaches.  (R.

244-46, 302-03, 329-30, 323-25).  Furthermore, Dr. Hastings found Thompson to be

neurologically intact based on MRI studies, and he found no sign of traumatic brain injury.  (R.

324-25).  In May 2008, Dr. Pettingell had new studies done that were unremarkable, and he

found no objective neuropsychological results to indicate the presence of a mild traumatic brain

injury.  (R. 415-16).  All of this is substantial evidence that supported the ALJ's decision at Step

Two that Thompson's headaches were medically non-determinable, and, while it would have

been preferable for the ALJ to have referred to this evidence at this step, he did eventually

discuss all of this evidence.  (R. 24-27).  Therefore, substantial evidence supported the ALJ's

decision that Thompson's claims of headaches were not medically determinable, and there was

no reversible error.

**Allegation of Error at Step Three**

Thompson claims error at Step Three in that the ALJ failed to consider if he met Listing

1.04 for a spinal disorder.  Plaintiff's Opening Brief, Dkt. #12, p. 7.  Thompson also claims that

the ALJ erred at Step Three by failing to consider the combined impact of his impairments.  *Id.*

At 7-8.  It is error, at Step Three, when an ALJ does not explain the evidence or the reasoning for

determining that a claimant is not disabled at this stage.  *Clifton v. Chater*, 79 F.3d 1007, 1008-

09 (10th Cir. 1996).

The present case, however, falls directly within *Fischer-Ross v. Barnhart*, 431 F.3d 729

(10th Cir. 2005).  In *Fischer-Ross*, the Tenth Circuit discussed the requirements of *Clifton* and

the rules for determination of disability at some length.  The ALJ in *Fischer-Ross* had failed to

include any facts or analysis in Step Three, but had only included the statement that "a review of

the medical evidence fails to reveal the existence of an impairment or combination of impairments which specifically meets or equals the criteria" of any listing.  *Fischer-Ross*, 431 F.3d at 731-32.  The district court held that this was reversible error because the court could not adequately review the bare conclusion.  The district court went on, however, to uphold the ALJ's determination at Steps Four and Five that the claimant's RFC allowed her to perform a significant number of occupations.  *Id.* at 732.  The district court remanded so that the ALJ could provide a "sufficiently explicit rejection of Claimant's disability claim at step three," and that in that case, the ALJ's conclusion would be affirmed because the district court had already found that the ALJ's analysis at Steps Four and Five was supported by substantial evidence.  *Id.* at 732-33.

On appeal to the Tenth Circuit, the claimant in *Fischer-Ross* did not address the substance of the Commissioner's argument that the ALJ's evaluation and specific findings at Steps Four and Five precluded a favorable ruling at Step Three, and instead argued that *Clifton* required remand because the ALJ's Step Three discussion was "insufficiently detailed."  The Tenth Circuit rejected this *per se* rule, saying that it would lead "to purely formalistic remands unjustifiably prolonging administrative proceedings."  *Fischer-Ross*, 431 F.3d at 733.  Instead, the court agreed that:

> an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment.

*Id.*  The court then turned to whether the ALJ's findings at Steps Four and Five justified his Step Three conclusions, and found that the ALJ's specific findings at those steps contradicted a conclusion that the claimant's problems could meet the severity required to be conclusively presumed disabled under any of the pertinent listings.  *Id.* at 734-35.  The court therefore

reversed the district court and affirmed the ALJ's administrative determination. *Id.* at 735.

Here the ALJ made an RFC determination and an analysis at Step Five that are supported by substantial evidence and that are free from reversible error, as discussed below. Because the ALJ's analysis at Step Five is adequate, there is no possibility that a reasonable fact finder could find that Thompson's spinal condition met the severity level required by Listing 1.04 or that his combined impairments met a Listing. The ALJ's failure to discuss Listing 1.04 or the effect of Thompson's combined impairments at Step Three was not reversible error.

**The ALJ's Consideration of Pain and Non-Exertional Limitations**

Thompson's brief says that the ALJ did not properly evaluate his non-exertional limitations, and he makes a reference to pain and to inability to sleep. Plaintiff's Opening Brief, Dkt. #12, p. 8. Because Thompson failed to develop this argument regarding pain and inability to sleep, the Court finds that it has been waived because it does not allow for meaningful review. *Wall*, 561 F.3d at 1066.

If the Court were to consider this argument, a review of the ALJ's decision would lead to the conclusion that he adequately considered Thompson's claims of disabling pain. The ALJ reviewed Thompson's testimony, including his testimony that he only slept 3-4 hours per night and his descriptions of pain. (R. 23-24). The ALJ, after reviewing the medical evidence, then said that Thompson exaggerated at least some of his symptoms, including disabling pain. (R. 27). Thompson has not challenged the ALJ's credibility assessment, and if he had that argument would have been unavailing. The ALJ gave several specific reasons for finding Thompson less than fully credible, and those reasons were closely linked to substantial evidence, as required. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. Thus, Thompson's perfunctory argument regarding pain and inability to sleep is not

successful, and the ALJ's decision is affirmed on this point.

**The ALJ's RFC Determination**

Thompson includes a heading in his brief that states that the ALJ's RFC was erroneous, but the brief then gives fleeting references to the hypotheticals presented to the vocational expert. Plaintiff's Opening Brief, Dkt. #12, pp. 9-10.  It is unclear, then, if Thompson is objecting to the RFC, or if he is asserting that the vocational expert's testimony did not constitute substantial evidence supporting his Step Five conclusion.  Thompson states that some of the hypotheticals presented to the vocational expert did not consider Thompson's "pain, inability to sleep, difficulty lifting, walking and standing, his diminished use of his dominant hand, or the use of a cane." *Id.* at 9.   The ALJ's analysis of Thompson's pain and inability to sleep has previously been discussed and the undersigned finds no error on that point.

Regarding the exertional difficulties of Thompson, the ALJ thoroughly discussed Thompson's testimony and the medical evidence.  (R. 23-27).  Even though the ALJ found that Thompson was not fully credible, the ALJ nevertheless included numerous exertional limitations in his RFC determination.  (R. 22-23).  He found that Thompson could only do light work, and that he needed to be able to change positions every half hour.  (R. 22).  He found that Thompson could never climb ladders and could only occasionally climb stairs, balance, bend, stoop, crouch, kneel, or crawl.  (R. 22-23).  Thus, while Thompson apparently asserts that the ALJ ignored his claims regarding his exertional limitations, the ALJ in reality found a rather limited RFC that accommodated many of Thompson's claims.

For the remaining assertions, such as Thompson's claim of diminished use of his left dominant hand, there was substantial evidence supporting the ALJ's omission of a limitation relating to this claim in his RFC determination.  For example, Dr. Pettingell stated that the

objective medical evidence showed no explanation for Thompson's reported left-sided symptoms, and he stated that when Thompson was informed of the results of the tests, he limited his complaints to his back and left leg.  (R. 415-16).  Dr. Pettingell stated that Thompson could return to work with no restrictions.  *Id.*  The ALJ summarized the report of Dr. Pettingell, and it was one of the pieces of evidence considered by the ALJ in determining Thompson's RFC.  (R. 27).   To the extent that Thompson has submitted an argument relating to the ALJ's RFC determination that is sufficiently developed to be capable of review, the undersigned finds that the ALJ's RFC determination was supported by substantial evidence and is free of reversible error.

**The Argument Related to the Grids**

Thompson makes a four-sentence argument that he could not perform the full range of light work and that at the sedentary level he would be considered disabled under the Grids at age 50.  Plaintiff's Opening Brief, Dkt. #12, pp. 9-10.  This is an innovative argument, but one with no support in the law, as one illustrative case shows.  *Heinritz v. Barnhart*, 191 Fed. Appx. 718, 720-25 (10th Cir. 2006) (unpublished).  In *Heinritz*, the ALJ found that the claimant had an RFC limited to light work with several additional limitations.  *Id.* at 720.   At Step Five, the ALJ relied on the testimony of the vocational expert that there were substantial numbers of jobs that the claimant could perform, and he therefore found the claimant was not disabled.  *Id.*  The claimant argued that he should be limited to sedentary work because then "he grids out."  *Id.* at 724.  The court found that it was not necessary to address this argument because the ALJ's Step Five finding was supported by substantial evidence that the claimant could perform several light jobs.  *Id.*

The present case is substantially similar to *Heinritz* in that Thompson was found to be

capable of performing light work with several additional limitations.  Here, Thompson has not

attacked the testimony of the vocational expert, other than the argument rejected above that the

hypothetical questions did not include all of Thompson's limitations.  The testimony of the

vocational expert is therefore substantial evidence that supports the ALJ's Step Five finding.  As

was true in *Heinritz*, it is unnecessary for this Court to further consider Thompson's argument

that he should be considered limited to sedentary work and therefore disabled under the Grids.

**Substantial Evidence**

Finally, the Court comments on Thompson's argument that the ALJ's decision was not

supported by substantial evidence.  While Thompson included this as a separate point of error

with a separate heading, he in no way elaborated on this basic point.  Therefore, this argument, as

a separate assertion, was waived as an undeveloped argument that does not allow for meaningful

review.  *Wall*, 561 F.3d at 1066.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct

legal standards were applied.  The decision is **AFFIRMED**.

Dated this 21 day of October, 2011.


Paul J. Cleary
United States Magistrate Judge